IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DIANE W SIRON,

      Plaintiff,

v.                            CASE NO. 1:16-cv-228-WTH-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,[1]

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for Disability Insurance Benefits and Supplemental Security

Income pursuant to Titles II and XVI of the Social Security Act (the Act).

ECF No. 1.  The Commissioner has answered, and both parties have filed

briefs outlining their respective positions.  ECF Nos. 11, 23, 24.  For the

reasons discussed below, the undersigned recommends that the

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Accordingly, pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill should be substituted for former Acting Commissioner of Social Security, Carolyn W. Colvin, as Defendant in this matter. The Clerk is directed to correct the docket accordingly.

Commissioner's decision be **AFFIRMED**.

# I.  PROCEDURAL HISTORY

Plaintiff's claim is based on her asserted intellectual disability pursuant to Listing 12.05.  This is Plaintiff's second appeal relating to her claim.  This Court previously affirmed the denial of benefits, and Plaintiff appealed to the Eleventh Circuit.  The Eleventh Circuit determined that the ALJ's decision to discredit Plaintiff's Full Scale IQ of 59 in favor of her Perceptual Reasoning Index (PRI) score of 73 was not supported by substantial evidence.  The Court remanded with instructions for the district court to remand for a new hearing.  R. 607-12.

A new hearing was held before a different ALJ in December 2014. The ALJ again found that Plaintiff was not disabled.  R. 540-57, 564-98.[2] The Appeals Council denied review.  R. 491-96.  This appeal followed. Plaintiff asserts that the ALJ erred in his treatment of the Eleventh Circuit's remand opinion, and erred at Step Three by not finding Plaintiff disabled pursuant to Listing 12.05 B or 12.05C.  ECF No. 23.

# II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

---

[2] Following a subsequent application, Plaintiff was found disabled as of January 9, 2012, pursuant to Grid Rule 202.01 (R. 566-67).

substantial evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[4]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[5] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6]  However, the district court will reverse the Commissioner's decision on plenary review if

---

[3] *See* 42 U.S.C. § 405(g) (2000).

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[6] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10] First, if a claimant is working at a substantial gainful activity, he is not disabled.[11] Second, if a claimant does not have any impairment or

---

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 20016 version unless otherwise specified.).

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[12]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[13]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[14]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the

---

[12] 20 C.F.R. § 404.1520(c).

[13] 20 C.F.R. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.
3d 1274, 1278 (11th Cir. 2001).

claimant can perform currently exists in the national economy.[17]  The

Commissioner may satisfy this burden by pointing to the Medical-

Vocational Guidelines (the "Grids") for a conclusive determination that a

claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the Grids when "the

claimant has a non-exertional impairment which significantly limits his or

her basic work skills or when the claimant cannot perform a full range of

employment at the appropriate level of exertion."[19]  In a situation where

both exertional and non-exertional impairments are found, the ALJ is

---

[17] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[18] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[19] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[22]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

### A. Findings of the ALJ

Plaintiff alleged an onset date of January 18, 2001.  The ALJ determined that Plaintiff has the severe impairments of: borderline intellectual functioning, affective disorder, and anxiety disorder.  Plaintiff

---

[20] <u>Walker</u>, 826 F.2d at 1003.

[21] <u>Wolfe</u>, 86 F.3d at 1077-78.

[22] *See id.*

does not have an impairment or combination of impairments that meets or equals the listings. The ALJ rejected Plaintiff's claim that she met Listing 12.05B or 12.05C for intellectual disability. The ALJ found that the "paragraph B" criteria were not met because Plaintiff did not have a full scale IQ of 59 or less, and the "paragraph C" criteria were not met because Plaintiff does not have a full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The ALJ rejected Plaintiff's full scale IQ of 59 as an accurate measure of her intellectual functioning and instead adopted Dr. Tozzo-Julian's opinion that her PRI of 73 was the best measure of her intelligence. R. 547-48.

Based on the limitations determined by the ALJ, the ALJ concluded that Plaintiff has the RFC to perform medium exertion work with the limitations that she has a poor ability to read, write, and use numbers; she is capable of performing only simple, routine tasks; incapable of performing detailed or complex tasks; and limited to only occasional, brief, superficial interactions with the general public, coworkers, and supervisors. R. 549.

Relying on the testimony of a VE, the ALJ found that Plaintiff could not return to her past relevant work which included the semiskilled positions of cashier checker, hand sewer, nurse assistant, counter attendant, and furniture assembler, and the unskilled position of fast food worker.  R. 555.  The ALJ determined that a person with Plaintiff's age, education, work experience, and RFC would be able to perform various unskilled jobs at the light and medium exertional level that exist in substantial numbers in the national economy, such as: cleaner (industrial), carcass washer, egg washer, and racker.  R. 556.  The ALJ therefore found that Plaintiff was not disabled.  R. 557.

In considering Plaintiff's request for review, the Appeals Council received and reviewed additional evidence in the form of a school record from the 1971-72 school year reflecting that Plaintiff was in special education classes.  Plaintiff took classes in English, math, geography, art, P.E., home economics, typing, and history.  Plaintiff earned grades mostly in the B and C range.  R. 759.

The Appeals Council determined that the ALJ's new decision specifically addressed the issue raised by the Eleventh Circuit in its

remand because the ALJ pointed to specific findings by Dr. Tozzo-Julian

that supported a conclusion that Plaintiff's PRI was a more accurate

reflection of her intellectual functioning.  The Appeals Council also noted

that the ALJ cited other evidence in support of that conclusion, such as

Plaintiff's history of performing semiskilled work and other activities such

as driving, maintaining a residence, reading as a hobby, and socializing at

church.  *See* R. 167-74 (Plaintiff's function report dated 10/14/07).  The

Appeals Council observed that the Eleventh Circuit opinion stated that an

ALJ may reject an IQ score if supported by substantial evidence, and that

the ALJ had done so by evaluating Plaintiff's test results in light of the

opinions and other evidence from Dr. Tozzo-Julian, and Plaintiff's

"relatively accomplished activities of daily living."  The Appeals Council

held that while reference to special education may be suggestive of

impaired adaptive functioning prior to age 22, it is not dispositive and in

light of the other evidence of record, it was not persuasive.  R. 493-94.

## B.  *Relevant Records*

With respect to Plaintiff's medical records, the only impairment at

issue in this appeal is her alleged intellectual disability.  The Court's

summary of the medical evidence will focus on the records relevant to that claim.

The only intellectual testing in the record was performed by Dr. Carmen Tozzo-Julian in March 2010.  R. 481-86.  Dr. Tozzo-Julian's evaluation reflects that Plaintiff stated she last worked twelve years previously as a clerk in a feed store, and that she is unable to work due to pain in her shoulders, legs, and hands as well as depression and anxiety. Plaintiff was a good historian who related that she was the oldest of four children who witnessed her mother shoot her father when Plaintiff was fourteen years old.  Plaintiff lived with relatives while her mother was incarcerated.  Plaintiff dropped out of school after completing the ninth grade, but later returned to school and completed training as a Certified Nursing Assistant (CNA).  Plaintiff reported past work as a cook, cashier, a CNA, a receptionist, and in a furniture factory.  *Id*. at 481-82.

On examination, Plaintiff appeared depressed with a restricted affect, but was cooperative.  Expressive and receptive language were average, eye contact was appropriate, and she was oriented to time, place, and person.  She was able to complete serial threes but not sevens.  She was

unable to spell "world" backward correctly.  Plaintiff was able to remember and complete a simple three-step directive.  Digit span was moderately impaired, and memory functions were mildly impaired.  She could name the current but not the previous president.  Her thoughts were logical, and her verbal reasoning skills were below average.  *Id*. at 482-83.

Plaintiff's WAIS-IV Full Scale IQ was 59, placing her in the first percentile.  Dr. Tozzo-Julian noted that there were significant differences in the index scores.  Plaintiff's Verbal Comprehension Index was 68, in the extremely low to borderline range.  She showed relative strength on the vocabulary subtest.  *Id*. at 483-84.

Given Plaintiff's history of learning disabilities, Dr. Tozzo-Julian concluded that the PRI score of 73, in the borderline range, appeared to be the best measure of her overall intelligence.  Plaintiff demonstrated relative strength on the Block Design Subtest, which measures visual spatial abilities and visual construction skills.  Her Working Memory Index of 58 and Processing Speed Index of 59 were in the extremely low range. *Id*. at 484.

A Personality Assessment Inventory (PAI) reflected that Plaintiff's

answers were truthful and she did not exaggerate her symptoms.  Her responses reflected a clinical anxiety disorder and history of trauma.  R. 485.

In the conclusions, Dr. Tozzo-Julian opined that Plaintiff was functioning in the borderline range of intelligence.  Her strengths included a good prior work history and a supportive husband.  Her prognosis was poor due to anxiety, pain, physical limitations, and moderate deficits in attention.  Dr. Tozzo-Julian's recommendations included individual therapy for depression and pain management.

Dr. Tozzo-Julian completed a medical source statement reflecting that Plaintiff has no limitations in ability to understand, remember, and carry out simple instructions, mild limitations in the ability to make judgments on simple work-related decisions, and moderate limitations regarding complex instructions and decisions and interaction with others.  R. 487-88.

## C.  *Hearing Testimony*

At her administrative hearing on December 8, 2009, Plaintiff was 53 years old.  She testified that she went to school through the ninth grade

and stopped working in 1998 due to an illness.  Her most recent job was as

a desk clerk at a feed store but she was let go when they found out she

"didn't have an education."  Prior to that she worked sewing furniture

covers and as a nursing assistant.  Plaintiff testified that her pets are her

hobby and that she used to go to church but does not now because of

anxiety.  She lives with her husband and occasionally does the grocery

shopping.  She has a driver's license and drives occasionally.  She also

cooks and does some of the household chores.  R. 11-34.

Plaintiff was 57 years old at the time of the hearing on remand.  R.

566-91.  She testified that she completed ninth grade, but was unable to

get her GED because she could not comprehend the material.  Plaintiff

was in special education classes in school.  She was married at age 17.

She can read a newspaper but does not understand half of what she

reads.  She is able to make change "a little bit".  Plaintiff acquired her

driver's license when she was around 20.  She needed help and she took

the test nine times.

Plaintiff reported past work as a cashier for a fertilizer company, a

furniture maker, restaurant work, fast food cashier, CNA in a nursing home,

and sewer at a textile company.  Plaintiff testified that she was let go from the furniture company because she could not catch on.  When she worked as a cashier she needed help because her register would be short.  She worked at the fertilizer company as a cashier for about two years, but she was let go because she did not have a high school education.  She stopped working as a fast-food cashier after she was injured on the job. Plaintiff testified that she is unable to work because she has difficulty comprehending things and being around crowds.

Plaintiff testified that if she goes shopping she goes in the morning or late at night before it is crowded.  She testified that she has panic attacks around crowds, but she has not seen a mental health expert for panic attacks.  She needs her husband's help to get in the shower and get in and out of the bathtub.  She fell in the tub once, and is nervous about bathing alone.  Plaintiff does some cooking, but on two occasions she burned food because she forgot about it.  She was able to do dishes and laundry, but cleaning house triggered her COPD.

Plaintiff's counsel argued in closing that she met Listing 12.05B.  The ALJ asked counsel to describe Plaintiff's maladaptive functioning, and he

noted Plaintiff's anxiety, social ability, placement in special education, and

difficulty getting her drivers license.  Counsel argued that there was no

evidence to support using Plaintiff's PRI as the measure of her ability, and

that with an IQ of 59 and evidence of maladaptive functioning prior to age

22, the Listing is satisfied.  R. 597.

## IV. DISCUSSION

Plaintiff contends that the ALJ ignored the Eleventh Circuit's ruling,

incorrectly attributed the Eleventh Circuit's opinion to the district court, and

then stated that the opinion was incorrect.  ECF No. 23 at 25.

The ALJ explained that the case was remanded by the district court

for further proceedings.  This statement is correct; the Eleventh Circuit

remanded the case to the district court with instructions to remand it to the

Commissioner.  *See* R. 606.  The district court's remand order quotes the

Eleventh Circuit as holding that "[t]he ALJ's decision to discredit [plaintiff's]

full scale IQ in favor of her PRI score is not supported by substantial

evidence."  *Id*.  This is an accurate quote, although the Eleventh Circuit

went on to explain the basis of its ruling as stemming from the ALJ's

reliance on Dr. Tozzo-Julian's opinion, which the Court found conclusory. R. 610-11.  The undersigned finds no error in the ALJ's description of the procedural posture of the remand.

The ALJ then stated that the "District Court" misinterpreted the "prior decision" because it was Dr. Tozzo-Julian, not the prior ALJ, who "discredited" Plaintiff's full-scale IQ score.  R. 543.  It is unclear whether the ALJ was actually referring to the district court's remand order, which only partially quotes the Eleventh Circuit's ruling, or if he was referring to the Eleventh Circuit's opinion.  In any event, it appears that the ALJ on remand was simply trying to clarify the basis of the prior ALJ's decision in the introductory portion of the new decision.  Even if there is a misstatement regarding which court issued the ruling, the error does not appear to have had any substantive effect on the ALJ's decision.

Plaintiff argues that the ALJ erred at step three by not finding that she met the requirements of Listing 12.05B or 12.05C for intellectual disability due to her low IQ score and additional severe mental impairments.  Plaintiff contends that the ALJ's and Appeals Council's failure to do so is contrary to the Eleventh Circuit's opinion.  ECF No. 23.

Listing 12.05 regarding intellectual disability (formerly referred to as mental retardation) requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[23]  The diagnostic description states that an individual is intellectually disabled if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."[24] Subaverage general intellectual functioning refers to an IQ of about 70 or below on various standardized intelligence tests.[25]

---

[23] 20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (codified at 20 CFR Parts 404 and 416).

[24] Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22."  Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

[25] DSM-IV at 42.

In general, a claimant meets the criteria for "presumptive disability" under Listing 12.05B by presenting a valid IQ score of 59 or less. Listing 12.05C requires that the claimant have a "valid verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional and significant work-related limitation or function."[26]

As the Eleventh Circuit held in Plaintiff's previous appeal, "'[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, *we use the lowest of these in conjunction with 12.05.'"* R. 609-10 (quoting 20 C.F.R. pt. 404, subpart P, app. 1 § 12.00(D)(6)(c)) (emphasis added). "'Generally, it is preferable to use IQ measures that are *wide in scope and include items that test both verbal and performance abilities.'" Id.* (citing § 12.00(D)(6)(d)) (emphasis added). "'However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.'" *Id.* (citing §

---

[26] 20 C.F.R. Part 404, App. 1, Subpart P, 12.05C.

12.00(D)(6)(a)); *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986) (per

curiam)).  Reports that "'[do] not include the quantum of medical evidence

required to document whether the results of the intelligence test were

consistent with the plaintiff's daily behavior'" are given less weight than

those that "'ma[k]e the required specific findings regarding plaintiffs mental

condition, and extensively discuss[] her personal and medical history and

current lifestyle in support of [the] findings.'" *Id*. (quoting *Strunk v. Heckler,*

732 F.2d 1357, 1360 (7th Cir. 1984)).

The Court concluded that the ALJ should have applied Plaintiff's full

scale IQ of 59 in assessing whether she satisfied the Listing, because that

was the lowest score.  The Court added that "an ALJ may reject the lowest

IQ score," but the ALJ in the first decision had not supported such rejection

with substantial evidence.  The Court observed that cases affirming an

ALJ's rejection of an IQ score "overwhelmingly indicated that the claimant"

was attempting to appear in an unfavorable light.  The Court further found

that Dr. Tozzo-Julian's determination was conclusory and unsupported by

her other findings regarding Plaintiff's intellectual functioning.  *Id*. at 611-

12.

Notably, as the Appeals Council explained, the Listing also states that "[i]n considering the validity of a test result, [the Commissioner] should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities."  R. 493 (quoting § 12.00(D)(5)(c)).  Moreover, in remanding for a further hearing regarding the ALJ's rejection of Plaintiff's lowest IQ score, the Eleventh Circuit did not address whether Plaintiff satisfied the component of the Listing relating to deficits in adaptive functioning.  IQ alone is not enough to determine intellectual disability because "[i]mpairments in adaptive functioning, rather than low IQ, are usually the presenting symptoms in individuals with [intellectual disability]."[27]  While the IQ often remains stable, adaptive function can improve with training,[28] and therefore a valid IQ score is not enough to determine if someone is intellectually disabled.[29]

---

[27] <u>DSM-IV</u> at 42.

[28] <u>Id.</u>

[29] "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."  <u>See Lowery v. Sullivan</u>, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing <u>Popp v. Heckler</u>, 779 F.2d 1497, 1499 (11th Cir. 1986)).

In this case, on remand, the ALJ cited additional record support and reasons for accepting Dr. Tozzo-Julian's opinion that Plaintiff's PRI of 73 was the best measure of her intelligence and for rejecting the full scale IQ of 59 as an invalid measure.  The ALJ pointed out that Dr. Tozzo-Julian noted "significant differences" between Plaintiff's index scores, and that such differences required that each domain be considered *independently*.  R. 484, 549.  Dr. Tozzo-Julian explained that Plaintiff's PRI of 73, in the borderline range, was made up of subtests showing that Plaintiff demonstrated relative strength on the Block Design Subtest, measuring visual spatial abilities and construction skills, and weakness on the Matrix Reasoning Subtest, measuring understanding of abstract concepts and nonverbal reasoning.  In contrast, the Full Scale IQ is a measure of "general cognitive abilities and scholastic aptitude."  Given Plaintiff's history of learning disabilities, Dr. Tozzo-Julian concluded that the Full Scale IQ of 59 did not reflect a valid measure of Plaintiff's intellectual ability.  The undersigned does not find Dr. Tozzo-Julian's opinion to be conclusory, because it is based on specific reference to Plaintiff's personal history of learning disabilities.

Further, as the ALJ explained, Dr. Tozzo-Julian's diagnosis of borderline intellectual functioning, based on her more accurate PRI of 73, is more consistent with Plaintiff's past relevant work than an IQ of 59 because almost all of Plaintiff's past work was performed at the semi-skilled level.  Dr. Tozzo-Julian's assessment reflected some deficits in mental functioning, but identified no limitations in Plaintiff's ability to understand, remember, and carry out simple instructions, and only moderate difficulties performing more complex tasks and interacting with others.  R. 549.  The ALJ's assessment of the testing results conforms to the Listing's requirement to "note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities," which in this case were found by the Appeals Council to be "relatively accomplished."  R. 493; *see* § 12.00(D)(5)(c).

Lastly, the ALJ further noted that Plaintiff did not satisfy the Listing for intellectual disability because the record did not demonstrate any deficits in adaptive functioning initially manifested during the developmental period.  Again, Plaintiff had a history of performing work for many years at the semiskilled level, and her self-reports of functional abilities included

reading as a hobby, maintaining a house, caring for pets, driving, socializing, and attending church.   While she presented a school record that reflected referral to special education, as the Appeals Council noted her grades were mostly B's and C's, and in light of the other evidence of her activities the school record did not persuasively establish deficits in adaptive functioning.  R. 493, 548-49.

In sum, the ALJ's conclusion that Plaintiff does not meet the requirements of Listing 12.05B or 12.05C is supported by substantial evidence.   Specifically, substantial evidence supports the ALJ's decision to reject Plaintiff's Full Scale IQ of 59 as an accurate measure of her intellectual ability and to instead adopt Dr. Tozzo-Julian's opinion that her PRI of 73 is an accurate measure.  Further, the evidence does not establish the required deficits in adaptive functioning.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**DONE AND ORDERED** this 30th day of May 2017.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.